# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Kellogg Brown & Root Services, Inc. | ) ASBCA No. 58175 |
| | ) |
| Under Contract No. DAAA09-02-D-0007 | ) |

APPEARANCES FOR THE APPELLANT:    Margaret T. Brenner, Esq.
    John T. Klug, Esq.
    Mark A. Font, Esq.
      Schirrmeister Diaz-Arrastia Brem LLP
      Houston, TX

APPEARANCES FOR THE GOVERNMENT:    E. Michael Chiaparas, Esq.
      DCMA Chief Trial Attorney
    Carol L. Matsunaga, Esq.
      Senior Trial Attorney
      Defense Contract Management Agency
      Carson, CA

## OPINION BY ADMINISTRATIVE JUDGE SCOTT
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Kellogg Brown & Root Services, Inc. (KBR), appealed under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, from the contracting officer's (CO's) final decision asserting an $11,483,487 claim against it for subcontractor costs paid to KBR under a task order (TO) issued under its subject indefinite delivery indefinite quantity (IDIQ) contract with the U.S. Army for logistical support. KBR moved to dismiss the appeal for lack of jurisdiction on the ground that the government's claim had accrued more than six years before the CO's decision and was barred by the CDA's six-year statute of limitations. 41 U.S.C. § 7103(a)(4)(A). The government opposed and requested a hearing on the jurisdictional issue, which the Board conducted in August 2014. In December 2014 the Court of Appeals held in *Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315 (Fed. Cir. 2104), that the CDA's statute of limitations was not jurisdictional. In supplemental briefing to address *Sikorsky*, appellant asserted, *inter alia*, that the Board should treat its motion as one for summary judgment. Despite some arguments to the contrary in briefing, both parties now contend that there are no material facts in dispute on the six-year limitations issue[1] and we concur. Because discovery has occurred and there has been a hearing, under the circumstances of this appeal we treat

---

[1]  This was confirmed in a 27 January 2015 joint teleconference, post-briefing.

appellant's motion as one for summary judgment on the statute of limitations question and the government's opposition as a cross-motion for summary judgment on that issue.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

1. Effective 14 December 2001, the U.S. Army awarded the subject IDIQ contract to Brown & Root Services pursuant to the Army's Logistics Civil Augmentation Program (LOGCAP). On 1 August 2003 the contract was novated to KBR, a subsidiary of Kellogg Brown & Root, Inc.[2] The contract, hereafter sometimes "LOGCAP III," required KBR, among other things, to provide combat services support, including dining facility (DFAC) services, for overseas contingency operations.[3] TOs could be issued on a firm-fixed-price or cost-reimbursement basis. (R4, tab 1; compl. and answer ¶ 10; app. mot. at 6-7, ¶ 1; gov't opp'n at 4, ¶ 1)

2. The contract incorporated Federal Acquisition Regulation (FAR) 52.216-7, ALLOWABLE COST AND PAYMENT (MAR 2000) (R4, tab 1 at 36[4]), which provided in part that the government would pay invoiced amounts determined to be allowable by the CO under FAR Subpart 31.2, including certain payments to subcontractors. *See* FAR 52.216-7(a) and (b)(1)(ii)(A)(*1*).

3. Effective 13 June 2003 the Army issued cost-plus-award-fee TO No. 59 to KBR, for logistics and life support services necessary to support Operation Iraqi Freedom. The performance period, as extended, expired on 30 April 2005. The Defense Contract Management Agency (DCMA) administered the TO. (R4, tab 2; app. mot. at 7, ¶ 2; gov't opp'n at 4-5, ¶ 2)

4. Statement of Work (SOW), Change 5, incorporated into TO No. 59 by Modification (Mod.) No. 06, effective 3 October 2003, required KBR to provide DFAC services at over 25 Iraqi sites, including Qaiyara Mosul West, site H-3. The SOW, paragraph 1.0, provided that services for each site were specified "in accordance with the site population" (R4, tab 3 at 63). For site H-3 the SOW specified a minimum of 5,200 personnel. Under SOW, paragraph 1.4, unless otherwise specified, all SOW increases, decreases or modifications were to be directed by the administrative contracting officer (ACO). (R4, tab 3 at 55, 63, 95, *see* tab 4 at 106) SOW Change 6 V10.2 to TO No. 59, dated 3 November 2003, reflected headcounts for DFAC purposes at site H-3 at two levels, 4,300 and 2,200, for a total of 6,500 (app. supp. R4, tab 31 at 1522).

5. KBR first subcontracted for DFAC services at site H-3 with The Event Source (TES). In early 2004, KBR solicited bids for a replacement subcontract. (App. supp. R4,

---

[2] The record includes other iterations of the contractor's name. For ease we use "KBR."

[3] In brief, a "contingency operation" refers to a military operation. *See* FAR 2.101.

[4] Page references are typically to Bates numbers.

2

tab 29, subtabs B, C, *see* tab 100 at 2477, notes 1, 11; app. mot. at 7-8, ¶ 3) On or about 8 February 2004, KBR awarded Subcontract No. SK00425 (SK425) to Gulf Catering Co. (GCC) under which GCC was to prepare and serve an estimated 5,400 meals per meal period (four per day) at site H-3. The performance period ended on 13 February 2005. The subcontract had fixed monthly prices for the DFAC facility *et al.*, daily labor rates and monthly prices for equipment at total estimated not-to-exceed (NTE) prices based upon the 5,400 headcount. (R4, tab 4 at 105-06) If quantities were to "increase or decrease for a sustained period," the charges could be adjusted within 10 days' notice by either party (*id.* at 103). The subcontract stated:

> **NOTE**: [GCC] will invoice and be paid for **Actual Headcount** only. The Projected Headcount section on the "Projected Daily Headcount Sheet and Actual Headcount" attachment is for planning and preparation purposes only.
>
> The incorporated form entitled "Projected Daily Headcount Sheet and Actual Headcount" **MUST** be completed on a daily basis....

(*Id.*) Under a Subsistence Prime Vendor (SPV) program (*see* SOF ¶ 10), GCC was to eliminate food costs on 5 April 2004 (R4, tab 4 at 103).

6. By memorandum of 9 February 2004, BG Carter Ham, USA, Commanding, Headquarters, Task Force Olympia, Mosul, Iraq, sought to increase headcount-based LOGCAP services at base camp H-1 and decrease them at other sites, including H-3, due to population shifts. For site H-3, headcount was reduced from 6,500 to 1,422. (R4, tab 5 at 118) By email on 17 February 2004, Lt Col Russell Blaine, USAF, the ACO and Commander, DCMA Northern Iraq, sent KBR a "Letter of Technical Direction" (LOTD) regarding TO No. 59 and "H Site Planning Figures" (*id.* at 114). He attached BG Ham's memorandum and asked KBR to use revised planning figures for five sites in northern Iraq, including H-3, for which the new planning headcount was 1,422, until further notice. KBR was to "appropriately adjust the levels of population-based service dedicated to sites H2-H5" (*id.*). The ACO stated that the government believed the change was within the contract's scope and that cost impact should be minimal. He asked KBR to submit within five days the increase or decrease in its original estimated cost, a schedule, proposed performance criteria, and suggested SOW changes. (R4, tab 5 at 114, 118) There is no evidence that this was done. Lt Col Blaine did not send a copy of the LOTD to the Defense Contract Audit Agency (DCAA). That was not standard practice. (Ex. A-23 (Blaine dep.) at 108)

7. KBR acknowledges that it "did not reduce costs to correspond with the reduced headcount planning figure for Site H-3" (app. mot. at 8, ¶ 4); fixed pricing for categories and headcount ranges continued through the life of the subcontract; and "SK425's pricing

3

was never based on actual headcounts or the 1422 planning figure of the February 17, 2004 e-mail" [the LOTD] (*id.* at 9, ¶ 6).

8. While Lt Col Blaine had access to LOTDs, he was not aware at any time while he was in Iraq that KBR did not comply with the LOTD with respect to site H-3. He did not see SK425, or modifications to it, or any KBR invoices while he was in Iraq. (Tr. 210; Blaine dep. at 105-07) KBR contends that it sent a copy of SK425 to him on 9 February 2004 (app. mot. at 7-8, ¶ 3), but the email it cites refers to TO No. 59 "ADVANCE NOTIFICATION." The apparent attachment is an "ADVANCE NOTIFICATION" pertaining to SK425 that responds to questions concerning the contractor's compliance with subcontract award criteria and does not detail the subcontract's covered services or payment processes. (R4, tab 17 at 435-36) Lt Col Blaine explained:

> [T]here was no conversation about site H-3 specifically with KBR. At my level, what I was working to address with KBR was simply the challenges of working through the global challenge of transitioning to OIF [Operation Iraqi Freedom]-2.
> So that involved sitting with them and talking with them at a far broader level about how to get good data across Northern Iraq.... I did not speak with them about implementation challenges at H[-]3.
>
> ....
>
> ...I had responsibility for managing KBR's performance in Theater, and...I'm sure part of that was how they went about doing their contracting.
> But...the luxury of being able to work with them to get [past] that point of privity to assess specifics with a subcontractor was simply not present in Iraq, so we became very much a sampling organization....
>
> ....
>
> ...I understood that there were...some issues with consistency in the way head count was managed, the number of meals that were served, and in some cases...the quality of food.

(Blaine dep. at 105-07)

9. DCAA's Iraq Branch Office (IBO) issued a Memorandum for Distribution dated 25 February 2004 on the subject "Early Alert on [KBR] DFAC Subcontracting

4

Practices Relating to [LOGCAP III]." The distribution list covered several DCMA and other offices, and included Lt Col Blaine. The memorandum's focus was upon KBR's use of fixed-price subcontracts and billing methodologies that might not be in the government's best interests. (App. supp. R4, tab 44)

10. On 10 April 2004, KBR and GCC executed Change Order No. 1 to SK425, due to the SPV program, under which food at all DFAC facilities was to be provided by a contractor under direct contract with the government. The change reduced the NTE value of DFAC operations at site H-3 by $3,003,518. Among other things, it revised meal prices to reflect actual days of service and implemented a new pricing structure to correspond with two stated camp population ranges: 4,501-5,500 and 5,501-6,500. It did not refer to the LOTD's 1,422 population. The new pricing methodology was applied retroactively to subcontract inception. (R4, tab 6 at 120, 124; app. supp. R4, tab 29, subtab I at 876-79; app. mot. at 9, ¶ 5; gov't opp'n at 6, ¶ 7)

11. Maj Ramona McCaa, a DCMA ACO in Mosul, Iraq, from November 2003 to April or May 2004, provided administrative direction at the H-sites in Mosul. She apparently prepared and sent the LOTD to KBR at Lt Col Blaine's direction. In any event, she saw it in February 2004 and had a copy. While she was in Iraq she was not aware whether KBR modified any of its dining facility subcontracts, including at site H-3. She never saw any dining facility subcontract for H-3. Although she did spot performance checks, she did not monitor KBR's responses to LOTDs. Maj McCaa was not responsible for monitoring costs incurred by KBR under LOGCAP III. She did not communicate with DCAA while she was in Mosul. After she returned to the United States, she provided some continuing support in connection with her Iraq work. (Tr. 36, 38, 41-43, 46, 53; Blaine dep. at 32)

12. Mod. No. 14, effective 11 May 2004, incorporated SOW Change 7 V3 into TO No. 59. Appendix B to the change gave a headcount of 1,422 for DFAC services at site H-3. (R4, tab 7 at 130, 151, 153)

13. KBR issued four more change orders to SK425 between June 2004 and 14 March 2005, to add funding and extend performance to 15 June 2005. It did not adjust the DFAC services at site H-3 in accordance with the LOTD. (R4, tabs 8, 10, 11, 13; app. mot. at 9, ¶ 6; gov't opp'n at 6, ¶ 9)

14. In mid-June 2004 Karen Klaus, a DCAA technical specialist, became part of a DCAA team to address concerns, mostly by its IBO, about overbilling at "first generation DFACs" – the subcontracts awarded when LOGCAP III began (tr. 56-57). She was tasked mostly with J-sites under TO No. 44, not the H-sites. It was her understanding that, when the first-generation DFAC subcontracts ended, KBR changed its billing methodology for the second generation subcontracts due to DCAA's concerns about headcounts. SK425 was a second generation subcontract. (Tr. 54-58, 60-63)

5

15. In October 2004 the Army formed a Special Cost Analysis Team (SCAT) comprised of Army acquisition specialists, DCAA and DCMA, supported by independent contract pricing specialists, to resolve billing and payment issues with KBR pending since December 2003. The U.S. Army Field Support Command (AFSC) announced a settlement in April 2005 under which it would pay $1.18 billion to KBR for billed costs for DFAC services in Kuwait and Iraq during the initial months of Operation Iraqi Freedom and AFSC and KBR agreed to convert portions of the 14 affected TOs (unidentified) from cost-plus-award-fee to firm-fixed-price. The agreement did not affect the government's right to recover funds as the result of current or future investigations. (*See* app. supp. R4, tab 107)

16. On 27 October 2004, under DCAA Audit Assignment No. 3311-2004K17900097 (assignment No. 97), Ms. Klaus advised KBR that DCAA would review the DFAC agreements priced under a new methodology and asked for a schedule of DFAC re-pricings and copies of subcontract agreements and invoices for sites that had been re-priced. This was not a standard DCAA DFAC subcontract audit and no audit opinion was intended. It was a short term, preliminary evaluation of the DFAC methodology under the new agreements – a "quick analysis" (tr. 66). SK425 was not audited in 2004 or 2005. (App. supp. R4, tab 99; tr. 63-66)

17. Ms. Klaus summarized her work as follows:

> [W]e were looking at the way the subcontract agreements were structured, and in most of these new DFAC agreements, they set head count bands so that...if actuals fell in this band, then they should bill based on that band, which would allow more reasonable pricing structure. At least that's what we believed at the time.

> We were just looking at the pricing structure. We were looking at the award of those agreements to make sure that we weren't encountering some of the same issues from before.... We had a lot of – in the initial DFACs where they didn't necessarily do price reasonableness determination, at least not up front.

(Tr. 60-61) DCAA's major concern with the DFAC subcontracts was "primarily on the basis of head count, the fact that in some cases, they were billing head counts that more than doubled or tripled the actual head counts that were on the ground, the actual boots in the door" (tr. 61-62).

18. Ms. Klaus's 22 December 2004 worksheet states that its purpose was to "show the significant decrease in cost that was achieved by changing the billing

6

methodology from billing a minimum headcount to billing cost of meals served plus set monthly fixed and semi-variable cost" (app. supp. R4, tab 100 at 2477). Site H-3 was among many sites reviewed (*id.*) Ms. Klaus's group looked at SK425 from the standpoint that it was competitively awarded. That was not the type of subcontract they were concerned about. She did not review LOGCAP III's requirements, but DCAA had looked at them earlier. This time, DCAA's primary purpose was to see if subcontractors were billing in accordance with subcontract terms. She did not review the allowability and allocability of costs incurred by KBR for SK425. (Tr. 68, 70-71)

19. William F. Daneke, Branch Manager of DCAA's Arlington, Texas, Branch Office (ABO), issued a memorandum to the Team Chief, TO No. 59, SCAT, dated 23 December 2004 on "DCAA Support of Fact-Finding and Negotiations for DFAC Subcontract Costs on [LOGCAP III]," which stated in part:

> As reported in our Statements of Condition and Recommendations (SOCARs) and audit reports issued from May through September 2004, we questioned subcontractor DFAC costs billed based on headcounts that substantially exceeded the patrons served....
>
> As a direct result of our audit effort on the initial DFAC subcontracts in late 2003 and early 2004, KBR renegotiated the DFAC subcontracts using more reasonable pricing methodologies resulting in significantly less DFAC costs.

(App. supp. R4, tab 84 at 26-27) The memorandum reported that DCAA had suspended 19.35 percent of KBR costs for billings under the "old" DFAC subcontracts due to its billing substantially higher headcounts than actual headcounts, based upon KBR's own analysis. An attachment indicated overbillings by subcontractors at various sites, including by former subcontractor TES at site H-3. The memorandum reflects that a copy was furnished to CO Jim Loehrl, Army Field Support Command, Rock Island, Illinois, and to DCMA SACO Jerry Conry (roles undefined). (*Id.* at 29, 31)

20. In a 24 January 2005 letter to Todd Bishop, KBR's Director, Government Compliance, DCAA conveyed its "Concerns Regarding Pricing Methodology of Re-Priced/Renegotiated DFAC Subcontracts" (app. supp. R4, tab 72 at 2202). DCAA had discussed its concerns with the Army's SCAT team leader, Ms. Lynn DeRoche, and had issued the letter as a result (tr. 97-98). DCAA noted that its audit of cost billings under the initial subcontracts had expressed concerns about billing methodology; KBR had subsequently established a "Tiger Team" to evaluate the DFAC subcontracts; KBR had concluded that more realistic pricing was necessary; and KBR had re-priced or re-negotiated new subcontract agreements for DFAC services at most sites. DCAA

7

requested clarification about projected headcount ranges used for billing certain costs. It stated that monthly rates for certain costs under the new agreements, which included SK425, varied significantly among sites and were inconsistent with headcount projections. DCAA asked KBR to explain the variability of labor costs across sites, including H-3, and to justify headcount numbers used for billing, which significantly exceeded actual headcounts in some cases, including H-3, where the SOW headcount was shown as 4,501-5,500 and the average actual headcount was 2,019, with the highest at 2,695. Mr. Daneke's letter indicates that a copy was provided to CO Loehrl and to the SCAT chief. (App. supp. R4, tab 72 at 2202-03, 2207-08) At this time, DCAA's conclusions were based upon limited information. It had not received all information it had requested. (App. supp. R4, tab 108; tr. 69)

21. In a 28 February 2005 teleconference DCAA discussed its concerns with the Army's SCAT team leader and with KBR (app. supp. R4, tab 91 at 2444, *see* tab 104).

22. By memorandum dated 29 March 2005 DCAA's ABO asked the IBO for assistance with its audit of KBR's contractor fiscal year (FY) 2004 direct costs under LOGCAP III. DCAA had selected a sample of 2004 DFAC subcontracts to evaluate costs for allowability, allocability, and reasonableness. The procurement files were located in Iraq. SK425 was one of many subcontracts the IBO was asked to evaluate. Part of the evaluation process was reviewing invoices billed in 2004 (1) to ensure that headcounts billed were covered by the ranges in the subcontract and, if not, to determine how the subcontractor had billed and why the subcontract had not been revised to include the relevant ranges and (2) for compliance with subcontract terms to ensure the invoices were based upon actual headcounts within the correct headcount range in the subcontract. (App. supp. R4, tab 87 at 264-67)

23. By email of 14 April 2005 to KBR's Mr. Bishop, copied to supervisory DCAA auditor Jody Niebruegge (tr. 56), Ms. Klaus stated that DCAA was still awaiting KBR's responses concerning items addressed in DCAA's 24 January 2005 letter and in the 28 February 2005 teleconference, including subcontract price reasonableness; KBR's planned adjustment of headcount ranges in some of the new agreements to include more price ranges and/or more realistic ranges; and KBR's plan to issue "credit memos" for sites where subcontractors invoiced based on incorrect rates not applicable to the headcount ranges experienced and which had been overbilled. (App. supp. R4, tab 104)

24. Effective 1 May 2005, AFSC issued a $4,972,882,216 cost-plus-award-fee TO No. 89 to KBR, with performance through 30 April 2006, for DFAC services at several sites, including H-3, where the headcount was listed at 5,000 (R4, tab 12 at 255-56, 290-91).

25. On 22 July 2005 a DCAA auditor in its Boeing St. Louis Resident Office provided Theodore Needham, then an employee of KBR consultant Navigant Consulting, Inc., with a spreadsheet showing data requested by DCAA pertaining to several

8

subcontracts, including SK425. The data included invoices, subcontracts and any change orders. This was in connection with Audit Assignment No. 2005K12980001, "Review of DFAC Vendor Billings in Public Vouchers." (App. supp. R4, tab 88 at 2403-04; app. mot., app'x, tab E, Needham decl. (Needham decl.) ¶¶ 2, 4)

26. On or about 23 August 2005, as Mr. Needham advised DCAA, the DFAC procurement files it had requested were moved from Kuwait to Camp Victory in Iraq, the IBO's location (app. supp. R4, tab 89; Needham decl. ¶¶ 6, 7, ex. 4 at 2446).

27. A draft DCAA Memorandum for Record (MFR) dated 26 September 2005 concerning "Cost Savings for Dining Facilities on [KBR] LOGCAP III," identified cost savings of $321.8 million as a result of ABO and IBO audits of DFAC subcontract costs said to cover 61 DFAC sites. The draft stated that DCAA had issued four audit reports covering 14 sites and SOCARs covering 34 sites. DCAA found that billed meals and headcount significantly exceeded those served at all but site J-10. It "questioned $351.7 million of excess meals/headcount billed as unreasonable, not in accordance with contract terms and conditions, and therefore unallowable" (app. supp. R4, tab 90 at 2408). H-3 was not clearly listed as one of the sites for which audit reports or SOCARs were issued, but it likely was in a group containing sites H-1 and H-5 because the MFR included site H-3 in several places, under the prior TES subcontract and under SK425. However, assignment No. 97 (SOF ¶ 16) was not among the covered assignments listed. (App. supp. R4, tab 90, e.g., at 2408, 2419, 2422, 2427, 2431, 2433, 2435, 2436, 2437, 2441)

28. On 29 September 2005, under assignment No. 97, DCAA issued an MFR on "New DFAC Subcontract Methodology" (app. supp. R4, tab 91; tr. 64). Ms. Klaus was primarily responsible for its preparation. Its purpose was to close the assignment file and present the auditors' conclusions. (See R4, tabs 96, 116; tr. 63-65, 104-06) The MFR noted benefits of the new methodology and concerns, similar to those expressed in DCAA's 24 January 2005 letter to KBR (SOF ¶ 20). Although H-3 was not mentioned as an example, it had been among the sites examined (app. supp. R4, tab 115 at 2517). The MFR stated in part:

> 3. <u>Projected headcount ranges used for billing certain costs</u>
> KBR needs to provide documentation/rationale justifying the headcount numbers used for billing. Certain costs under the new agreements, such as labor, continue to be based on headcounts which significantly exceed actual headcounts in some cases. Our evaluation of labor costs priced under the new subcontracts noted actual headcounts are often significantly below the [SOW] headcount projections on which the monthly labor costs are based.... The headcount projections on which some of the subcontract costs are based should be updated to reflect

more realistic projections than the SOW headcount projections included in the prime contract, which has not been updated. More current and accurate headcount information is available and should be considered when negotiating the new agreements.

(App. supp. R4, tab 91 at 2443) The MFR reported that, in the 28 February 2005 teleconference, KBR indicated it would respond to DCAA's concerns but it had not, and KBR had not responded to DCAA's further inquiry of 14 April 2005. DCAA stated that it would follow up under Audit Assignment No. 2005K17900016. (*Id.* at 2444)[5]

29. When Ms. Klaus was performing her assignment No. 97 in 2004 and 2005 she was not familiar with LOTDs issued by ACOs in Iraq. She did not see any LOTDs contemporaneously and did not recall seeing any GCC SK425 invoices. Part of KBR's SK425 file had been provided to DCAA by July 2005, among 17 new DFAC agreements and documentation. During this litigation it was pointed out to Ms. Klaus that the LOTD was in a CD covering another subcontract. This was apparently part of a package of 47 DFAC subcontracts and documentation provided by KBR to DCAA electronically by 23 August 2005. Invoices were included. The SK425 procurement file provided by KBR did not include a copy of the LOTD. (App. supp. R4, tabs 108, 109 (dtd. 28 June 2005), *see also* tabs 29, 88, 89, 92; tr. 68-70, 80, 154-55; Needham decl. ¶ 7)

30. By vouchers dated between June 2004 and July 2005 (plus 2006 demobilization), KBR billed the government for SK425 costs said to have been incurred (app. mot., app'x B). The vouchers were submitted twice a month at the TO level. All listed costs, not just DFAC, would be on one voucher. Vouchers sometimes contained hundreds or thousands of lines. (Tr. 253) We have not been directed to government payment dates for services billed in connection with site H-3, but the government has not refuted appellant's statement that KBR was paid for DFAC services including for site H-3 in 2004 and 2005 (app. reply at 12).

31. Subtab I of what appellant identifies as KBR's SK425 procurement file as of 2 October 2009 contains what appear to be KBR monthly listings of daily headcounts of meals served under SK425 at site H-3 in 2004 and 2005. The monthly listings are signed by a U.S. military representative and by KBR and GCC representatives. (App. supp. R4, tab 29 at 1 and at Bates 1, subtab I at 824, 852, 880, 930, 943, 1016, 1059, 1112, 1166, 1232, 1234, 1236)

32. On 6 December 2005 *qui tam* plaintiff Barrington T. Godfrey filed a False Claims Act, 31 U.S.C. § 3729, action under seal, in the U.S. District Court for the Eastern

---

[5] The government does not dispute appellant's statement that, during discovery, the government could not produce any documents related to this assignment.

District of Virginia. Among other things involving other sites and subcontracts, Mr. Godfrey alleged that under SK425, for site H-3, GCC had provided only 60 percent of the contracted DFAC labor force but had billed for the full force. He claimed that GCC was vastly overcharging for labor and consumables and that it had been paid from February 2004 for a headcount of 5,400, but the actual headcount had averaged 1,000 and had never exceeded 1,321. He did not mention the LOTD. He alleged that he had reported the overbilling to KBR and that his actions to correct it had been frustrated. He did not allege that he had notified the government of any overcharging prior to his sealed court action. (Ex. A-20 at 9-10, ex. A-21 at 1)

33. George Duggan, a senior DCAA auditor, went to Iraq in February 2007 to work on open DFAC audits (tr. 163-66). He began an audit of SK425 after learning in March 2007 about potential overbilling under another subcontract from a KBR subcontract manager who referred him to a consultant, James Ransburg. Mr. Ransburg, who worked for KBR subcontractor Horn Consulting, was getting DFAC subcontracts ready for closeout and examining billing inconsistencies. KBR supplied Mr. Duggan with Mr. Ransburg's reports, which identified things that Mr. Duggan testified DCAA "knew nothing about." (Tr. 167-68) Mr. Ransburg mentioned the LOTD at issue, which was the first time Mr. Duggan had heard of an LOTD. He asked for a copy. It was not in the SK425 file KBR had given to DCAA. Mr. Duggan testified credibly that he believed that DCAA first learned that KBR had not complied with the LOTD when he discovered Mr. Ransburg's reports and verified them through audit. (Tr. 168-71) Appellant did not rebut his evidence and there is no evidence to the contrary.

34. On 23 April 2007 the U.S. Attorney's Office filed a notice in the *qui tam* action that it would not then intervene. On 1 May 2007 the court unsealed the complaint and allowed Mr. Godfrey to serve it upon the defendants. (Ex. A-21 at 2593)

35. On 16 November 2007 DCAA's IBO issued a draft SOCAR to KBR which stated that it had overbilled the government for SK425 under TO No. 59, contrary to the Allowable Cost and Payment clause and FAR 31.201-3, Determining Reasonableness. The draft SOCAR stated in part:

> Actual average monthly headcounts recorded for DFAC services from the beginning of the subcontract, in February 2004, through June 2005 were all below the [SOW] headcount of 5,000, with the highest count at 2,647 and the lowest at 812. For all but two of the seventeen months of the subcontract...the subcontract pricing table did not include lower headcount bands that would have accommodated the actual lower monthly headcounts. Nor did [KBR] revise the subcontract pricing tables until subcontract change order no. 6, dated March 15, 2005. Yet, according to [KBR

11

consultant Ransburg], as stated in his subcontract analysis memorandum, dated June 19, 2006, [an LOTD] from the government, dated February 17, 2004, directed [KBR] to use 1,422 as the average headcount for this subcontract.

    ....

    [KBR] should comply with the FAR cites identified above and issue a credit to the government for the amounts of unreasonable costs explicated above and detailed in the attached schedules.

(R4, tab 14 at 388-89)

36. On 16 April 2008 the U.S. District Court entered judgment in the *qui tam* action in favor of KBR (ex. A-21 at 2599).

37. By letter of 9 July 2008, KBR notified Kristan Mendoza, procuring CO at Headquarters, Army Sustainment Command (ASC), Rock Island, Illinois, of a billing adjustment under SK425, affecting TO Nos. 59 and 89 and resulting in a $9,406,108 credit to the government. KBR stated that it had advised ASC, DCMA and DCAA in late 2007 that it had initiated a review of DFAC subcontracts in Iraq due to questions DCAA had raised in various requests and reports and the credit was the result of KBR's analysis. (R4, tab 15 at 397) KBR explained and qualified the credit as follows:

    On February 17, 2004, DCMA Northern Iraq issued [an LOTD] that reduced the estimated headcount (HC) for dining facility services at site H-3.... KBR inadvertently did not consider the impact [of] this LOTD in the context of unique language in [SK425], which allowed KBR to reduce the monthly price for labor and equipment when a sustained HC reduction occurred. Similarly, KBR negotiated prices for consumables and support services..., which were added to [SK425] after the LOTD had been issued, based upon the initial HC estimate. The adjustment in billings equals what [SK425] prices should have been for labor, equipment, consumables and support services as a result of the LOTD.

    KBR's review to date supports the appropriateness of a credit in the amount identified above. KBR, however, has not completed its review of all relevant facts. Should the review uncover facts that reveal that no credit is required or that the amount identified above is too high or too low, KBR reserves

12

the right to either eliminate the credit or to adjust the amount of the credit.

(*Id.*) There is no evidence that the government knew or should have known of any larger amount due at that time.

38. DCAA's IBO issued an assist audit report on 29 September 2008 on KBR's FY 2004 and 2005 DFAC procurements under LOGCAP III, TO Nos. 59 and 89, and SK425. It found that some subcontract costs were billed, and KBR paid, for headcounts exceeding actual headcounts that used DFAC services. (R4, tab 16 at 402-03) Questioned costs totaled $12.2 million. The stated significant issues with subcontract billings were that (1) KBR overpaid for DFAC services because GCC billed using prices and headcount bands that did not comport with the actual number of personnel using the DFAC services and (2) KBR did not include headcount bands in its DFAC subcontract pricing schedules that would have covered the lower monthly headcounts actually experienced. (*Id.* at 403-04) DCAA applied "regression analysis" using SK425's pricing table to determine what it considered to be a more representative headcount band range (*id.* at 409, 414). The assist audit report did not mention the LOTD.

39. By letter to CO Mendoza of 11 February 2010, KBR submitted a certified claim for $9,406,108.34, the amount of its prior credit, plus interest, denying liability and asserting that it was entitled to reimbursement for its reasonable, allowable, and allocable LOGCAP III costs. The claim stated that, during an Operation Iraqi Freedom transition period, the government had issued conflicting directions regarding headcount requirements at Iraqi sites and had rescinded the LOTD. (R4, tab 17 at 420, 422)

40. By letter to KBR of 18 June 2010, ACO Antonio James stated that KBR had advised him that it intended to bill for the claimed amount. He stated that he concurred with this process, it should resolve the claim, and he would defer issuing a final decision. (App. supp. R4, tab 78 at 2352) On 29 July 2010 KBR submitted vouchers for the amount of the withdrawn credit, which the government approved on about 10 August 2010. It applied the amount against alleged KBR debts to the government. In a 10 August 2010 email to the ACO, KBR stated that it had re-billed for the claimed amount at DCMA's request. (*See* R4, tabs 19, 20)

41. On 26 August 2010 KBR advised the ACO that it was treating the government's acceptance of its vouchers as a final determination that it was entitled to the $9,406,108.34 claimed amount and, if its understanding were correct, it would forego its interest claim (R4, tab 20). On 6 October 2010 the ACO responded that the government had made no determination regarding the allowability of SK425 costs submitted; it disavowed any representation that payment of KBR's interim voucher was a final determination that it was entitled to the amount paid; and "[s]ubject to...completion

13

of audits and reviews," the government believed that payment of that amount resolved KBR's request for interim payment (R4, tab 21).

42. On 28 April 2011 DCAA issued an audit report on costs incurred under SK425, and TO Nos. 59 and 89, for FYs 2004-06, which incorporated the assist audit report's findings (SOF ¶ 38). DCAA questioned $11,636,551 as unreasonable on the ground that KBR billed using headcount band pricing that did not represent actual headcounts. DCAA used regression analysis to determine a reasonable estimate for pricing actual headcounts. It stated that KBR had not incorporated into SK425 lower headcount bands proposed by GCC for the initial period, which better represented the actual headcount served. DCAA also questioned $565,500 as unallowable because GCC was paid monthly costs at a higher amount than the subcontract specified. (R4, tab 23 at 499-500, 503) The auditors stated:

> [KBR] contends its actions in not reducing headcount capacity under the subcontract were consistent with reasonable business judgment. We disagree with [KBR's] position based on the contractor being directed in [an LOTD], dated February 17, 2004, by the Government to adjust its level of service based on the reduction of headcounts. This instruction was ignored which resulted in the Government being overbilled.

(*Id.* at 509) On 3 May 2011 DCAA issued a Form 1 Notice No. 172 to KBR disapproving $12,415,060 (R4, tab 24).

43. By final decision dated 22 March 2012, ACO James determined that $12,179,846 in KBR's billed SK425 DFAC costs at site H-3 were unallowable, citing DCAA's 28 April 2011 audit report and its Form 1. He stated that the decision was "based on KBR's failure to reduce the H-3 DFAC headcount as directed by the LOTD dated February 17, 2004" (*see similarly* tr. 209, 212), and that "[c]osts incurred for services exceeding the services required by the ACO are unreasonable, and therefore unallowable." (R4, tab 28 at 542, 544) The decision also stated that it resolved KBR's 19 February 2010 claim; [6] the government had properly withheld KBR's voluntary credit; and KBR's claim for interest was denied. The ACO allowed $235,214 in costs from 13-27 February 2004, based upon the time between contract inception and KBR's receipt of the LOTD plus 10 days KBR was allowed under SK425 to implement changes. The final decision demanded payment by KBR of $11,483,487.74 (the disallowed

---

[6] The record does not indicate when the ACO received KBR's claim, but it does not contain a claim dated 19 February 2010. We assume that he was referring to KBR's claim dated 11 February 2010 (SOF ¶ 39).

$12,179,846 less $696,358.26 previously withheld). (R4, tab 28 at 542, 545; tr. 209, 212) KBR timely appealed to the Board on 19 June 2012.

## DISCUSSION

### The Parties' Contentions

Appellant contends that the government's 22 March 2012 claim is time-barred because it knew or should have known more than six years prior thereto, that is, before 22 March 2006, of all events that fixed KBR's alleged liability and permitted assertion of the claim. We have considered the parties' numerous, sometimes changing, arguments in their extensive briefs and in their opening statements at the jurisdictional hearing. We focus here upon, and summarize, their final arguments in their *Sikorsky* briefs.

Appellant alleges that *Sikorsky* was wrongly decided and the Board should not follow it but, if the CDA's six-year statute of limitations is not jurisdictional, then appellant's motion is tantamount to raising an affirmative defense that the government's claim is time-barred. Appellant acknowledges that, in this posture, it bears the burden of proof. Appellant contends that the government knew by 29 September 2005, the date of the MFR closing out assignment No. 97 (SOF ¶ 28), that KBR had billed for DFAC services under SK425 for site H-3 based upon headcounts exceeding actual average monthly headcounts. At that point the government could have claimed that those costs were unreasonable and unallowable.

Appellant further alleges that KBR's compliance with the ACO's LOTD is not the dispositive issue. Rather, the essential basis of the government's claim is that KBR charged unallowable costs. The government's position, in appellant's view, is that KBR was contractually bound, regardless of a TO's stated scope of work, to charge no more than the average monthly headcount at a DFAC. The ACO's final decision incorporated DCAA's Form 1 and the government's claim is based upon DCAA's damages model, which tracks headcounts, and is not based upon the LOTD.[7]

The government responds that *Sikorsky* is binding upon the Board. It alleges that appellant has not shown that the government knew or should have known, prior to KBR's

---

[7] Appellant did not reiterate its earlier argument that the government knew it had a claim based upon Mr. Godfrey's *qui tam* action, filed under seal on 6 December 2005. Appellant speculated that the government should have had ample opportunity to investigate the claim by 5 March 2006. (SOF ¶ 32; *see* tr. 26; app. post-hearing br. at 26, ¶ 54) In any event, that action did not mention the LOTD; the Department of Justice appears not to have concluded its investigation until about 23 April 2007; and the complaint was not unsealed until 1 May 2007, less than six years before the government asserted its claim (SOF ¶ 34).

15

consultant's disclosure to the government in 2007 (SOF ¶ 33), that KBR had failed to reduce the level of DFAC services procured for site H-3 in accordance with the LOTD. That failure was the basis for the government's determination that costs were unreasonable and unallowable and the basis of its claim.

The government elaborates that the issue of when it should have known of its claim turns on what facts were reasonably knowable by it, objectively. DCAA's review of KBR's DFAC subcontract methodology for pricing and billing pertained to KBR's allowing its subcontractors to bill for significantly more people than were actually served and not to KBR's procurement of a level of DFAC services substantially in excess of the government's stated requirement. There is no evidence that DCAA was aware of the discrepancy between the LOTD's requirements and those of SK425 and the subcontract's change orders. LOGCAP III's requirements were not the focus of DCAA's 2005 review. Rather, the focus was the reasonableness of subcontract prices and billings in comparison to subcontract requirements. That a copy of the LOTD was in one of 47 DFAC subcontract files given to DCAA in 2005, but not in the SK425 file at issue, does not support appellant's contention that the government should have known prior to the consultant's disclosure in 2007 that KBR had not complied with the LOTD. Moreover, upon KBR's July 2008 acknowledgment that it had not adjusted SK425 to accord with the LOTD, it provided a financial credit to the government. The government then had no basis for a claim. Its claim did not accrue until KBR later re-billed for the credited amount and the government paid the costs in 2010.

Further, according to the government, even if the Board were to find that the government's affirmative monetary claim accrued more than six years before the CO's final decision demanding payment and thus is time-barred, appellant would be entitled only to partial summary judgment because the allowability of the disputed costs it claims, and the CO denied as unallowable, remains at issue. Appellant bears the burden to prove that the challenged costs are reasonable and the issue of allowability cannot now be resolved by summary judgment. The government adds that, while a statute of limitations might bar it from asserting a claim to collect an amount due it, it does not bar it from invoking its administrative remedy of offset against appellant's claim. Appellant challenges this contention as untimely and invalid under the circumstances at issue.

<u>Summary Judgment Standards</u>

Summary judgment is a salutary method to resolve an appeal when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562-63 (Fed. Cir. 1987). Even when there is a factual dispute, a disputed fact is material only if it might make a difference in the appeal's outcome. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Cross-motions for summary judgment covering the same central issue can suggest that the material facts are undisputed. We resolve any significant doubt over

factual issues, and draw all reasonable inferences, in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987).

## CDA's Statute of Limitations and Claim Accrual

The CDA requires in pertinent part that "each claim by the Federal Government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 7103(a)(4)(A). In *Sikorsky*, the Federal Circuit held that the CDA's statute of limitations was not jurisdictional. Although appellant urges us not to follow *Sikorsky*, we are bound by the precedent established by our court of appeals. *E.L. Hamm & Associates, Inc.*, ASBCA No. 43972, 94-2 BCA ¶ 26,724 at 132,940; *Reflectone, Inc.*, ASBCA No. 43081, 93-3 BCA ¶ 25,966. Nonetheless, while no longer of jurisdictional import, the CDA's claim filing deadline remains. Failure to meet a statute of limitations is an affirmative defense, for which the invoking party bears the burden of proof. *See* FED. R. CIV. P. 8(c); *Bridgestone/Firestone Research, Inc. v. Automobile Club de L'Ouest de la France*, 245 F.3d 1359, 1361 (Fed. Cir. 2001).

FAR 33.201's definition of "Accrual of Claim" in effect at TO No. 59's 13 June 2003 award date (SOF ¶ 3), and now, is:

> "Accrual of a claim" means the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, monetary damages need not have been incurred.[8]

In evaluating when the claimed liability was fixed, we first examine the legal basis of the claim. *Gray Personnel, Inc.*, ASBCA No. 54652, 06-2 BCA ¶ 33,378 at 165,475 (involving contractor claim).

In *Holmes v. United States*, 657 F.3d 1303 (Fed. Cir. 2011), the Federal Circuit addressed the potential suspension of claim accrual in the context of the Tucker Act's six-year statute of limitations, 28 U.S.C. § 2501. It applied a "knew or should have known" of the claim test interchangeably with a "concealed or inherently unknowable" test, stating that the test includes an intrinsic reasonableness component. *Holmes*, 657 F.3d at 1317-18, 1320. The Board has applied these standards in assessing when a government claim has accrued under the CDA. *See Raytheon Co., Space & Airborne*

---

[8] The FAR 33.201 definition in effect on the 14 December 2001 LOGCAP III award date (SOF ¶ 1) is virtually the same.

*Systems*, ASBCA No. 57801 *et al.*, 13 BCA ¶ 35,319 at 173,376; *Raytheon Missile Systems*, ASBCA No. 58011, 13 BCA ¶ 35,241 at 173,017.

Accrual is not suspended until a contracting party with authority to assert the claim has knowledge of it or until the party performs an audit or financial analysis to determine the amount of its damages. *Raytheon Missile Systems*, 13 BCA ¶ 35,241 at 173,017-18. "Once a party is on notice that it has a potential claim, the statue of limitations can start to run." *Gray Personnel*, 06-2 BCA ¶ 33,378 at 165,476. Although the claim accrual definition contemplates the possibility of non-monetary injury, when monetary damages are alleged, some extra costs must have been incurred before liability can be fixed and a claim accrues, but there is no requirement that a sum certain be established. *McDonnell Douglas Services, Inc.*, ASBCA No. 56568, 10-1 BCA ¶ 34,325 at 169,528; *Gray Personnel*, 06-2 BCA ¶ 33,378 at 165,476.

The stated legal basis for the government's 22 March 2012 claim is that appellant failed to follow the ACO's direction in his February 2004 LOTD to reduce the site H-3 DFAC headcount, resulting in appellant's billing unreasonable and unallowable costs to the government for services exceeding those set by the ACO (SOF ¶ 43). Based upon its operative facts, we conclude that the more apt characterization of the government's claim is that it is seeking to recover the monies it had mistakenly paid KBR, plus an additional sum based upon DCAA's 28 April 2011 audit and its Form 1. The mistaken payment occurred on or after 10 August 2010, when the government applied the amount of KBR's $9,406,108 credit, which KBR had withdrawn in its 11 February 2010 claim, for the benefit of KBR (SOF ¶¶ 39, 40). Viewed in this light, the government's claim did not begin to accrue until 10 August 2010 at the earliest and the CO's decision was timely.

Alternatively, when we examine the government's stated basis of its claim, the record establishes that it did not know that KBR had failed to comply with the LOTD until at least March 2007. DCAA first learned of the failure to comply no earlier than March 2007, when a DCAA auditor obtained reports through a KBR consultant to that effect. (SOF ¶¶ 8, 11, 29, 33) This was less than six years before the CO asserted the government's claim on 22 March 2012 (SOF ¶ 43). The remaining question is whether the government should have known of its claim earlier. Applying the reasonableness factor inherent in a "should have known" inquiry, we conclude that the government should not be charged with knowledge prior to March 2007 that KBR had failed to comply with the LOTD. This is underscored by the fact that KBR itself, which was in a much better position than the government to know whether it had complied, in effect contended in its 9 July 2008 letter to the government offering it a $9,406,108 credit, that it did not appreciate, prior to 2007 at the earliest, that it had not complied with the LOTD (*see* SOF ¶ 37).

Lastly, even if appellant were correct in its characterization of the government's claim and of what it should have known, and the claim accrued prior to 2007, it was

satisfied by KBR's $9,406,108 credit to the government, made by 9 July 2008 (SOF ¶ 37). KBR could have raised the affirmative defense of payment against a government attempt thereafter to collect on its claim. *See* FED. R. CIV. P. 8(c). The credit adjustment was said by KBR to be "what [SK425] prices should have been for labor, equipment, consumables and support services as a result of the LOTD" (SOF ¶ 37). There is no evidence that the government knew or should have known of any larger amount due at that time (*id.*). A new government claim would not have begun to accrue until KBR revoked the credit when it submitted its own claim to the CO on 11 February 2010 (SOF ¶ 39). Thus, again, the government's 22 March 2012 claim was timely.

## DECISION

We deny appellant's motion for summary judgment that the government's claim is time-barred by the CDA's six-year statute of limitations and we grant the government's cross-motion for summary judgment that its claim is not time-barred.[9]

Dated: 13 May 2015

CHERYL L. SCOTT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

---

[9] In view of our resolution of the parties' motions, we do not reach their arguments concerning offset.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58175, Appeal of Kellogg Brown & Root Services, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
